# STATE OF MICHIGAN

# COURT OF APPEALS

AMANDA ANN PAULY,

Plaintiff/Cross-Defendant-
Appellant,

v

JEFFREY BERNARD HELTON,

Defendant/Cross-Plaintiff-Appellee.

UNPUBLISHED
August 23, 2016

No.   330805
Presque Isle Circuit Court
LC No.   15-084054-DS

AFTER REMAND

Before:  GLEICHER, P.J., and SAWYER and M. J. KELLY, JJ.

PER CURIAM.

We remanded this case to the circuit court with instructions to anchor its custody decision to the best-interest factors of MCL 722.23.  See *Pauly v Helton*, unpublished opinion per curiam of the Court of Appeals, issued May 17, 2016 (Docket No. 330805).  On remand, the court took up-to-date evidence at a continued hearing before analyzing each of the statutory factors.  The court then reaffirmed its earlier order granting primary physical custody of the couple's daughter to Amanda Pauly and of the couple's oldest son to Jeffrey Helton while awarding the parties joint physical custody of their youngest son.  We now affirm.

## I. UPDATED EVIDENTIARY HEARING

The circuit court originally accepted evidence regarding the parties' custody dispute at an August 5, 2015 hearing.  At the continued evidentiary hearing on remand, the parties provided up-to-date information regarding their children's development.

Pauly and Helton's daughter, MH, is now 17.  She will be a high school senior this fall and plans to augment her schedule with college courses.  Pauly testified that MH had spent no overnights with her father since the original custody order.  However, Helton followed MH's academic progress on the school's online parent portal and MH and Helton have worked toward healing their strained relationship.  Helton testified that he is home during the day while Pauly is not.  He has observed various teenage visitors while MH is left alone.  Helton reported that the teens used marijuana on the property.  Pauly confronted MH about Helton's reports but MH denied any wrongdoing.  Helton elicited testimony that Pauly had left MH home alone unsupervised for a long weekend while Pauly was vacationing in Pennsylvania.  Pauly admitted

-1-

that she did not tell Helton that MH would be left home alone and did not ask Helton to supervise her.

CH is now 13½.  His academic performance was "very rocky" after the court's earlier order, but he brought his grades up by the end of the school year.  Pauly testified that she only sees CH "once in a great while."  She frequently texted and called him and showed up for surprise visits, but CH had not been receptive.  Pauly opined that Helton used emotional blackmail to achieve this result.  Helton testified that he tried to convince CH to visit his mother and even created pretexts for CH to go over when Pauly was home.  Helton in turn accused Pauly of interfering with his relationship with the children.  Specifically, Helton noted that he often texted Pauly pictures of the children when they are in his care and she did not reciprocate.  Helton claimed that he mows Pauly's lawn and asked a friend to plow her driveway as further evidence of his good will.

JH is almost seven and will enter the second grade in the fall.  His first grade performance was low and his teacher recommended holding him back a year so he could improve his reading skills.  Pauly and Helton disagree on this issue.  Pauly wants JH to repeat the first grade.  Helton believes holding JH back because of his performance in one subject would be counterproductive, and that additional support should be sought instead.  Pauly admitted that both parents have a close bond with JH and he enjoys being at both houses.  But Pauly accused Helton of ignoring the pediatrician's nutritional advice to remedy a digestive condition.  The recommended course was to reduce dietary sugar levels, which was especially important, Pauly asserted, because Helton is diabetic, a condition that can be hereditary.  Since Helton moved out, it became more difficult for Pauly to discipline JH.  When given chores, JH becomes angry and walks next door to visit his father.  Helton also has been uncooperative in training JH to sleep in his own room.  As a result, JH does not want to sleep at Pauly's house where he is required to sleep in his own bed instead of with his parent.  Helton chastised Pauly for her lack of discipline in allowing JH to run off in this manner.

Helton remained unemployed at the continued hearing. Helton's application for Social Security Disability Income (SSDI) was denied and he has appealed that ruling.  In the past 10 months, Pauly witnessed Helton doing physical labor despite his claimed disability, including "load[ing] wood" and making house repairs.  To her knowledge, Helton had briefly worked in a consignment shop and earned goods in exchange for tasks.  Helton contradicted Pauly's testimony in this regard.  Helton claimed that he earned money by selling goods on the Internet. He received those goods in exchange for volunteering at a local resale shop.  Helton survived from Medicaid and $280 monthly child support.  Overall, Helton testified that his gross monthly income is less than $400.  He lives rent-free and outlined $244 in specific monthly expenses.  However, Helton admitted that he bears monthly obligations in excess of his income to repay outstanding child support arrearages for his three older children.  To make ends meet, Helton takes loans and gifts from friends, such as a hot water heater given free of charge.

Pauly, on the other hand, earned a raise to $13.78 an hour at Advance America since the last hearing.  She has only one more semester at Kirtland Community College where she is studying health information technology.  She hopes to then secure a position with higher pay or hours more conducive to raising a family.

Pauly's boyfriend, Shawn Guertin, moved into her home in January 2016. The two have been romantically involved for 1½ years. Guertin is 38 and has two children aged eight and four, of whom he has shared custody. Pauly reported that the two families have intermingled well. Guertin pays Pauly rent, which covers roughly half of the household expenses.

Pauly's counsel elicited testimony to remind the court that Helton had once embarrassed the family by swearing at the mother of a boy who beat CH at a wrestling match. Pauly presented a letter issued by the Onaway Schools superintendent on November 20, 2015, prohibiting Helton from entering any Onaway school building. The prohibition was entered after several incidents of "inappropriate behavior" establishing "a pattern that is no longer excusable or acceptable to the School." The letter advised Helton that he had "demonstrated your lack of reasonableness when you interact with the majority of every staff member in this building, and quite frankly you make the majority of the staff here very uncomfortable in your presence." Pauly also presented the cover sheet the elementary school principal, Mindy Horn, attached when she faxed the letter to Pauly. Horn commented, "Detrimental because he is unable to participate in their education in any way. Would be better for schooling needs for mom to have them during the week." Pauly complained that Helton did not share information regarding CH's education with Pauly after his ban so she could handle matters. Pauly admitted, however, that the information was available online for her review.

Helton explained that "there's been three incidents" underlying the school district's finding of a "pattern." The court would not allow Helton to elaborate. Helton admitted that he had a criminal record for drunk driving, illegally transferring a license plate tag, embezzlement, and writing nonsufficient funds checks. The last of these convictions occurred in the 1990s and no new evidence had been uncovered since the last hearing.

Pauly also presented screen shots of Facebook conversations in which Helton took part. Helton admitted that the documents revealed that he engaged in arguments on the posts of teenage girls regarding the existence of God. In the conversation stream, a third-party advised Helton that it was inappropriate to tell a teenage girl to "fuck off" when commenting on her post. Helton excused his behavior, claiming "I'm a very atheist person, and when somebody posts something, and it is directed towards me, I do take an offense." He admitted that he could "[i]gnore it" but felt it was his right to comment in such a manner because "this is social media."

The hardest part of the court's earlier order, in Pauly's estimation, was the division of the children into two households. She lamented the lack of family time for the siblings as there was no court-ordered time for them to live under the same roof. She therefore requested that the circuit court reconsider its position.

## II. CUSTODY ORDER

Following the evidentiary hearing, the circuit court issued an opinion and order considering the best-interest factors of MCL 722.23. In relation to factor (a), "[t]he love, affection, and other emotional ties" between the parents and children, the court found the parties equal in relation to JH. The factor weighed in Pauly's favor in relation to MH, and Helton's in relation to CH. The court weighed this factor based on the parties' testimony regarding the current status of their relationships with the children.

Factor (b) measures the parties' "capacity and disposition . . . to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." The court found that this factor favored Helton despite his ban from the school. Historically, Helton had been the stay-at-home parent while Pauly worked. Even after the ban, Helton kept up-to-date on the children's progress through email contact with teachers, monitoring their grades online, and creating a daily work chart for CH. Even knowing that Helton was banned from the schools, Pauly did not step up her involvement.

The court found that factor (c), "capacity and disposition . . . to provide the child with food, clothing, medical care . . ., and other material needs," weighed in Pauly's favor. Pauly has been the sole breadwinner for several years and works fulltime. She also attends college to improve her future earning capacity. Helton, on the other hand, was at the mercy of handouts from friends to provide for his children and his future income hinged on his SSDI appeal.

Factor (d) takes into account "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." The court noted that MH has always lived in a home with Pauly while CH has always lived in a home with Helton, only leaving the residence of the other parent for good after the court's August 31, 2015 order. JH on the other hand enjoyed shared custody but resided most days with Pauly. Accordingly, the court found the parties equal with relation to MH and CH,[1] and that the factor weighed in Pauly's favor in relation to JH.

Under factor (e), the court considered "[t]he permanence, as a family unit, of the existing . . . custodial . . . homes." The court found the parties equal after considering where each child had lived in the last 10 months and Pauly's introduction of a new romantic partner to her home.

The court found the parties equal in relation to factor (f), "the moral fitness of the parties." The court considered that Pauly had introduced an unrelated male into her home and Helton's ill-advised Facebook comments, but found that neither impacted their parenting ability. The court also acknowledged that Helton's temper had resulted in his ban from school property. The court determined that this ban did not impair his ability to participate in his children's education and "he was able to navigate around that hurdle."

The court found the parties equal in relation to their "mental and physical health" under factor (g). The court did not list any particular issues facing the parties, but noted that none interfered with their parenting ability.

The court considered the improved school records of MH and CH and their custodial parent's influence on that progress under factor (h), the child's "home, school, and community record." Accordingly, the court found that this factor weighed in favor of Pauly in relation to MH and Helton in relation to CH. The court determined that JH was "too young to have established a record in this regard," and therefore held the parties equal.

---

[1] To be more accurate, the court should have ruled that the factor favored Pauly as to MH and Helton as to CH.

It appears that the court conducted renewed in camera interviews with the children. The court indicated that it took the preferences of the children into consideration under factor (i).

The court then found the parties equal in relation to factor (j), "[t]he willingness and ability of the parties to facilitate and encourage a close and continuing parent-child relationship" with the other parent. In regard to this factor, the court determined that CH's "reluctance" to visit his mother "seems to be in spite of and not because of [Helton's] efforts to promote more interaction."

The court found that factor (k), gauging domestic violence, weighed slightly in Pauly's favor. This was based on Helton's "acknowledge[ment] that he can be verbally abusive."

Under the catch-all factor, (*l*), the court considered that it is generally in the best interests of siblings to keep them together. Although "[a]t first blush" the court's August 31, 2015 custody order seemed to split up the children, the children remained in close contact as they live in neighboring houses and may "go back and forth" at will. They also attend the same school. Ultimately, the court found "it would be cruel to add" to the difficulty facing the children by their parents' separation to "force[] separation of the child from the parent with whom s/he had the strongest bond."

III. ANALYSIS

Pauly continues to challenge the circuit court's custody order.

> Three different standards govern our review of a circuit court's decision in a child-custody dispute. We review findings of fact to determine if they are against the great weight of the evidence, we review discretionary decisions for an abuse of discretion, and we review questions of law for clear error. *Fletcher v Fletcher*, 447 Mich 871, 876-877; 526 NW2d 889 (1994). A clear legal error occurs when the circuit court "incorrectly chooses, interprets, or applies the law . . . ." *Id.* at 881. [*Kubicki v Sharpe*, 306 Mich App 525, 538; 858 NW2d 57 (2014).]

We must affirm all custody orders on appeal unless the trial court's findings were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue. MCL 722.28; *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). In reviewing the circuit court's factual findings regarding the best-interest factors, we must not "substitute [our] judgment . . . unless the factual determination clearly preponderates in the opposite direction." *Pierron*, 486 Mich at 85 (quotation marks and citation omitted). We are also bound to defer to the circuit court's assessment of witness credibility. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

Pauly contends that the circuit court's decision to split the siblings was against their best interests. She asserts that the court does not appreciate the impact of the split on the children. In her opinion, it is insufficient that the children live next door to each other and can "go back and forth" at any time. The difference in parenting styles and rules between the homes "shows how destructive and disruptive this split physical custodial arrangement" has been, she urges.

This Court has recognized the importance of protecting sibling bonds, but not at the expense of an individual child's wellbeing.

> The sibling bond and the potentially detrimental effects of physically severing that bond should be seriously considered in custody cases where the children likely have already experienced serious disruption in their lives as well as a sense of deep personal loss. Ultimately, however, it is the best interests of each individual child that will control the custody decision. . . . [I]n most cases it will be in the best interests of each child to keep brothers and sisters together. However, if keeping the children together is contrary to the best interests of an individual child, the best interests of that child will control. [*Wiechmann v Wiechmann*, 212 Mich App 436, 439-440; 538 NW2d 57 (1995).]

> Incumbent on the trial court . . . is the duty to apply all the statutory best interests factors to each individual child. To fully discharge this duty, and arrive at a decision that serves a particular child's best interests, trial courts must recognize and appreciate that implicit in the best interests factors themselves is the underlying notion that as children mature their needs change. And, as a child progresses through the different life stages, what they need from each parent necessarily evolves therewith. Thus, what may be in the "best interests" of an eight-year-old child may materially differ from the "best interests" of that child's thirteen-year-old sibling. Accordingly, the best interest[] factors must be fluid enough in their application to accommodate these differences. Indeed, unyielding judicial adherence to the notion that a child's best interests requires that siblings remain in the same household, may very well, in some cases, create a judicial straightjacket that brings an individual child's personal growth to a screeching halt. [*Foskett v Foskett*, 247 Mich App 1, 11-12; 634 NW2d 363 (2001).]

Contrary to Pauly's challenge, the circuit court expressly addressed the impact of its split custody award on the children in its opinion on remand. The court emphasized that the children go to the same school, live in neighboring houses, and are free under the custody award to go back and forth between their parents' homes as they please. Differing parenting styles are confusing to children in any custody case, but no evidence supports that the confusion was elevated in this case merely because the children do not live together under one roof.

Pauly also challenges the circuit court's conclusions under several best-interest factors. She first contends that the circuit court erred in weighing factor (b) in Helton's favor. Pauly contends that the court improperly focused on the parties' historical patterns in providing for the children's education instead of their "capacity and disposition" to provide for their educational needs. Pauly emphasized testimony at the earlier evidentiary hearing that she helped all the children with their math homework as she was also in school and more familiar with the topic. In the 10 months that CH lived exclusively with Helton, his math grade fell, proving Pauly's pivotal role in his education, she urges. Pauly further questions how Helton can provide for the children's educational needs when he has been banned from school property due to his threatening behavior.

We cannot conclude that the circuit court's findings were against the great weight of the evidence. Even after the superintendent prohibited Helton's presence on school property, Helton remained actively involved in the children's education. Helton monitored MH's and CH's grades online. When CH's performance fell, Helton created a daily work journal to keep CH on track and communicated with his teachers via email. Pauly admitted at the earlier hearing that she rarely communicated with the children's teachers and did not attend parent-teacher conferences because of her work schedule. Pauly did not claim that these circumstances had changed during the 2015/2016 school year. Moreover, although Pauly knew she could review the older children's grades online, she never did so.

In relation to JH, Helton explained the reasons he did not want his son to repeat the first grade. Helton described the extra reading assistance he had provided and would continue to provide to JH and gave examples of how Pauly and her mother could assist as well. Helton testified that Pauly procrastinated in meeting with JH's teacher to discuss the situation, and when she finally did so, that contact was inadequate.

Ultimately, we recognize that Pauly has a busy schedule of work and school while Helton is unemployed and therefore has more time to devote to the children's educations. Notwithstanding Pauly's work and school commitments, Helton's involvement tips the scales in his favor under this factor.

Pauly challenges the weight given to the parties under factors (d) and (e). She emphasizes that the children all lived together in the home Pauly still resides in from MH's birth through June 2015. In that home, each child has his or her own bedroom, while the boys choose to sleep in Helton's room at his house. Pauly describes Helton's living arrangements as unstable as he has no lease and his continued residence depends on the good graces of a friend. Pauly questions the stability of the home as well because Helton remains unemployed and still has not secured SSDI. As a result of this financial difficulty, his home was without water for an extended period and he needed to connect his house to Pauly's water system with a garden hose. He only recently secured a hot water heater so his children could bathe. Weighing in her favor, Pauly posits, is that her boyfriend of 1½ years has moved in. She asserts that he is a positive influence, gets along well with her children, and shares in household expenses and duties. Pauly further notes that her boyfriend attended the court-mandated SMILE program while Helton still has not participated.

Following the parties' June 2015 physical separation, CH voluntarily spent almost all his time in Helton's residence despite that he had lived in the neighboring house since birth with his mother as well as his father. According to Pauly, CH pulled away from her even before that, spending time solely with Helton after their November 2014 breakup. As such, the family unit in CH's eyes has consisted of himself and Helton for almost two years. We cannot fault the circuit court for crediting the permanence of that unit. Similarly, MH has spent most of her time with Pauly, both before and after the separation.

Although Pauly contends that factor (d) cannot weigh in Helton's favor because his home is not "stable," she produced no evidence in this regard. It is true that Helton is living in the neighbor's vacated home on charity and without a lease. There simply is no evidence, however, that the property owner intends to evict Helton at any point in the future. Rather, the property

owner continues to pay the property taxes and home owner's insurance and benefits from Helton's maintenance and improvement of the property. The evidence is stronger that the house itself is not "satisfactory." For example, the property previously did not have water service or a hot water heater. Helton has since secured both. Before that, CH was not impacted; he needed only walk next door to bathe and gather clean clothes.

Pauly questions how the court could find the parties equal in relation to factors (f) and (g), moral fitness and mental and physical health. Pauly notes evidence suggesting that Helton suffers from anger issues. She accuses Helton of using CH's image as his Facebook profile picture to lure teenage girls into friending him. She also suggests impropriety in Helton allowing the boys to sleep in his room when they are at his home. In relation to physical wellbeing, Pauly insists that Helton's medical conditions impact his parenting ability. Helton has not worked in several years because of his physical complaints. As such, he cannot provide for his children's basic needs.

The record supports that Helton likely has undiagnosed mental health issues that impact his ability to parent his children. It is undisputed that Helton is easily angered and dissolves into profanity even in front of the children and their friends and at school events. Helton's behavior estranged him from MH, who has only recently expressed willingness to work on healing the father-daughter relationship. Helton's behavior also intimidated and frightened school officials, leading to his ban. Even though Helton has found a way to remain involved in the children's education, this situation must be a source of embarrassment to the children. Accordingly, the circuit court should have found that factor (g) weighs in Pauly's favor.

In relation to moral fitness under factor (f), however, Pauly's implications of wrongdoing are without foundation. We agree with Pauly that Helton's exchanges with teenagers on Facebook are concerning, but not for the reason she suggests. There is no evidence that Helton lured these minors to friend him on Facebook by using a picture of CH on his profile. Many parents use images of their children instead of themselves out of a sense of pride. And the minors in question are familiar with both Helton and his children, supporting that they would realize "Jeff Helton" is the father, not the son. Rather, it is Helton's comments on posts made by minors that are concerning. Helton's angry outbursts and profane language are just as inappropriate in writing as they are in person. His Facebook commentary bolsters our belief that the circuit court erred in weighing factor (g).

Pauly also implies something sinister in Helton allowing CH and JH to sleep in bed with him. We find this implication bizarre as Pauly has never accused Helton of sexually abusing their children and there is absolutely no evidence of such abuse. Clearly, Pauly prefers JH to sleep in his own room while in her house. This is reasonable. And her work in this regard is certainly derailed when Helton does not enforce the rule in his home. Pauly is legitimately frustrated by this. But this frustration is no reason to resort to innuendo rather than evidence.

In relation to factor (j), Pauly makes several complaints, but most are unrelated to Helton's "willingness and ability" to facilitate her relationship with her children. That MH and JH "express[] disappointment" in Helton's favoritism of CH has no impact on Pauly's relationship with her children. Neither does Helton allowing CH to sleep in his room or Helton's violent outbursts at school. However, she does argue that Helton interferes with her relationship

with JH by frustrating her parenting goals. She cites JH's escapes to Helton's home to avoid obedience, Helton's refusal to assist her solo-sleep training, and Helton's ignoring JH's dietary needs. The parties clearly need to learn to work together as they share joint physical custody of JH. The failure to cooperate appears mutual, however, supporting the court's conclusion.

Pauly also contends that Helton uses emotional blackmail to keep CH from her. Helton denies this accusation and gave examples of his efforts to increase CH's interaction with his mother. That Helton is not at fault is supported by Pauly's own testimony that CH pulled away from her immediately after her breakup with Helton, even while the family was still residing together.

Despite our belief that the circuit court erred in weighing factor (g) (and likely mischaracterized its conclusion in relation to factor [d]), we discern no ground to upset its overall custody decision. The erroneous weighing of one and even two best-interest factors can be deemed harmless. See *Fletcher*, 447 Mich at 882, 885; *Maier v Maier*, 311 Mich App 218, 227; 874 NW2d 725 (2015). In actuality, the only change that would be occasioned by a remand in this case would be to award the parties joint physical custody of CH. Even with correction to the weighing of the best-interest factors, Pauly is still only favored under three factors in relation to CH (c, g, and k), while Helton is favored under four (a, b, d, and h). The parties are still equal in relation to factors (e), (f), and (j). Presumptively CH still prefers to reside with Helton, weighing in Helton's favor under factor (i). And " 'an expression of preference by an intelligent, unbiased child might be the determining factor in deciding what the "best interests" of the child are.' " *Maier*, 311 Mich App 225 (citations omitted). Under these circumstances, we find no error demanding relief.

We affirm.


/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Michael J. Kelly

-9-